1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11

12

13

14

15

16

17

RYAN WILSON and KRISTINA WILSON,
husband and wife, and their minor children
M.W. and K.W.,

Plaintiffs,

v.

SHERWIN-WILLIAMS COMPANY, an
Ohio Corporation; BALL AEROSOL AND
SPECIALITY CONTAINER HOLDING
CORPORATION, an Indiana corporation;
and, JOHN DOES 1-5,

Defendants.

Case No. C09-5333 RJB

ORDER ON DEFENDANT
THE SHERWIN-
WILLIAMS COMPANY'S
MOTION FOR
SUMMARY JUDGMENT
OF DISMISSAL

18

19

20

This matter comes before the Court on the Defendant The Sherwin-Williams Company's

(Sherwin-Williams) Motion for Summary Judgment of Dismissal.  Dkt. 64.  The Court has considered the

relevant pleadings and the file herein.

21

### I.   PROCEDURAL AND FACTUAL BACKGROUND

22

### A.   BASIC FACTS

23

24

25

26

27

28

On May 18, 2006, Plaintiff Ryan Wilson was at work at ACE Hardware ("ACE") in Bainbridge

Island, Washington.  Dkt. 68-4, at 3.  A customer came in asked Mr. Wilson and another ACE employee,

Mathew Quesada, questions about a spray can of Deft clear coat varnish.  Dkt. 68-4, at 3.  The customer

indicated that he could not hear an agitator ball in the can and wondered if it was mixing properly.  Dkt.

68-4, at 3.  Mr. Quesada states that he thought that there should have been an agitator ball in the can, so

he picked up the can the customer brought in and tapped it on the counter.  Dkt. 68-3, at 3-4.  Mr. Wilson

ORDER
Page - 1

1   states that he knew that the gloss was a thicker product than the semi gloss or the satin and that those cans

2   had an agitator ball, so he thought the gloss did as well.  Dkt. 68-4, at 5.  Mr. Wilson stated that it was his

3   experience that when certain products like this sit on the shelf, they become thick and it "takes an extra

4   hard shaking to knock it loose."  Dkt. 68-4, at 5.  Mr. Wilson, Mr. Quesada, and the customer went to the

5   aisle with other clear gloss urethane spray cans and began to shake those cans.  Dkt. 68-4, at 4.  Mr.

6   Quesada testified that he tapped another can of Deft on the shelf.  Dkt. 68-3, at 3.  Mr. Quesada states that

7   he picked up a spray can of Minwax[1] Helmsman Spar Urethane and tapped it on the metal shelf.  Dkt. 68-

8   3, at 3.  Mr. Quesada testified that he has worked a lot with spray paint.  Dkt. 75-3, at 27-28.  Mr.

9   Quesada testified that:

10      It's just with spray paints . . . a lot of times what can happen if a spray can, the bearing . . .
        gets settled at the bottom of the paint and the aerosol, and if it's really cold, it's hard to
11      shake it.  So we've always . . . . lightly tapped the cans, on side of the table or shelf, or
        even with my hand if it come out that easily.  That's just a given.  I mean, anyone who
12      works with spray paints can all say the same thing.

13   Dkt. 75-3, at 27-28.  In any event, at this point, Mr. Wilson took a few cans of Minwax Helmsman Spar

14   Urethane to a counter with a stainless steel surface.  Dkt. 68-4, at 3-4.  The stainless steel surface is used

15   to hammer lids on paint cans after tint has been added to the paint.  Dkt. 68-4, at 3.  Mr. Wilson testified

16   that he stood by the counter, shook one can, and read "almost the whole" label on an identical can.  Dkt.

17   68-4, at 4.  Mr. Wilson testified that after shaking the can, he then tapped the can on the counter two to

18   three times and it exploded.  Dkt. 68-4, at 8-9.  Mr. Wilson testified that nothing solid hit him, but the

19   contents of the can sprayed him in the face and eyes.  Dkt. 75-2, at 29.  He testified that he could not open

20   his eyes, and someone rushed him to the eyewash station in the store.  Dkt. 75-2, at 30.

21        Mr. Wilson states that cans fall off the shelves all the time at the store.  Dkt. 68-4, at 8.  He states

22   that when they fall, they hit the floor with more force than he used when he tapped the can.  Dkt. 68-4, at

23   8.  He acknowledged that there was a customer service number on the can, but opted not to call it.  Dkt.

24   68-4.  There is conflicting testimony in the record regarding how much force Mr. Wilson used.  Mr.

25   Michael Karpin, another ACE employee at the store states that he was standing with his back to Mr.

26   Wilson at the time of the accident.  Dkt. 75-3, at 19.  He states he heard "at leas [sic] four whacks like

27

28      [1]Defendant Sherwin-Williams purchased the Thompson-Minwax Company in 2002.  Dkt. 75, at 22.
     Although Thompson-Minwax Company no longer exists, Sherwin-Williams still uses the name as a trade
     name. *Id.*

ORDER
Page - 2

1    hammer to metal." Dkt. 75-3, at 19.  Mr. Quesada states he did not think that is what it sounded like.

2    Dkt. 75-3, at 33.

3        Mr. Wilson was taken to the emergency room due to injuries to his eyes. Dkt. 68-4, at 6.  After

4    about four days, the vision in his left eye improved. Dkt. 68-4, at 6.  He returned to work four or five

5    days after the accident. Dtk. 68-4, at 6.  His right eye has no central vision and has a little blurry

6    peripheral vision. Dkt. 68-4, at 7.

7        As it turns out, Minwax Helmsman Spar Urethane is a "uniform urethane gloss which does not

8    have separate elements that can settle into separate layers" and so does not have an agitator ball. Dkt. 66,

9    at 2.  The can was manufactured on September 20, 2005 (Dkt. 75, at 10) by Defendants Ball Aerosol and

10   Specialty Container Corporation ("Ball") and U.S. Can Corporation (U.S. Can and Ball are one and the

11   same, as the name of U.S. Can Corporation was changed to Ball when it merged with another entity) (*see*

12   Dkt. 1).  The can was then sent to a Sherwin-Williams plant. Dkt. 75, at 25.  Sherwin-Williams fills the

13   cans from Ball with the urethane, runs tests, caps and labels the cans. Dkt. 75, at 25.  The subject can is a

14   "necked-in" can, and was a "2N, 211 x 604" type can. Dkt. 65, at 2.  "Necked-in" means that "the

15   diameter at the top and bottom of the container have been reduced from the standard body wall in the

16   middle of the container." Dkt. 75-6, at 8.  Sherwin-Williams' Director of Marketing, Patricia M. Macko,

17   states that the necked-in designed of the can is the "industry norm for aerosol can packaging." Dkt. 66, at

18   2.  The subject product is extremely flammable, is self-pressurized, and is intended for household use.

19   Dkt. 67, at 2.  Sherwin-Williams asserts that the subject can meets industry and DOT standards with

20   regard to testing and to heat tolerances. Dkt. 75-1, at 31.

21       John Blum, of Ball, testified that there is no practical benefit of the necked-in design verses a

22   straight-sided design. Dkt. 75-6, at 8.  (A straight-sided design is a can where "the diameter of the body

23   wall is the same in the middle, top portion of the can and the bottom of the can." Dkt. 75-6, at 8-9.)  Mr.

24   Blum testified that in 2005, Ball made around 300 to 500 million neck-in cans. Dkt. 75-6, at 13.  Mr.

25   Blum testified that he had been involved in around four other cases involving circumferential failures of

26   necked-in cans. Dkt. 76-6, at 15-16.  He testified that the necked-in design is for "pure aesthetics." Dkt.

27   75-6, at 8.  Mr. Blum testified that when the subject Minwax can was manufactured, the straight-sided

28   design was an alternative design that was available. Dkt. 75-6, at 9.  Mr. Blum did testify that there is a

ORDER
Page - 3

1  slight mass difference, on the order of 2-3%. Dkt. 75-6, at 9.  In response to the question "[d]oes the fact

2  that there is the necked-in feature make the container more susceptible to circumferential failure through

3  what you want to call 'product abuse,' versus with the straight-sided design?", Mr. Blum testified that

4  "the neck-in can's resistance to an axial load is reduced over that of a straight-sided can by the nature of

5  the neck." Dkt. 75-6, at 22.  He further testified:

6      Q.  And so is that one reason, in your opinion, why you've had reports of a number of
        failures - circumferential failure in the necked-in design and none that you're aware of in
7       the straight-sided design? . . .
        A.  It could play a part in the number of the instances that have been reported to us.  But it
8       could also be attributed to the type of container used and that more necked-in cans are used
        than straight-sided cans.
9       Q.  Yeah.  But back - I think you said back in 2000 the market share was about 50/50
        necked-in versus straight sided?
10      A.  Yes.
        Q.  And you've had a number of reports of circumferential failures in the necked in design,
11      right?
        A.  Yes.
12      Q.  And zero in the straight-sided design, right?
        A.  Yes.  None that I'm aware of.
13

14  Dkt. 75-6, at 22.  Mr. Blum testified that it is Sherwin-Williams who decided that the necked-in design

15  would be used for this Minwax product. Dkt. 75-6, at 31.  Mr. Blum further stated that Ball was charging

16  Sherwin-Williams the same price for either the necked-in design and the straight-sided design.  Dkt. 75-7,

17  at 12.  Sherwin-Williams acknowledges that they made the decision to use the necked-in design for

18  aesthetic reasons. Dkt. 75-8, at 23.

19      Anatol Bilyk, also a Ball employee, testified that he observed that the subject can's bottom was

20  completely detached.  Dkt. 68-2, at 2.  Mr. Bilyk stated that he observed sections on the bottom of the can

21  with an "elephant foot." *Id.*  He described an "elephant's foot" as a section of "flare" out of the bottom of

22  the can. Dkt. 68-2, at 2.  Mr. Blum, of Ball, described an "elephant's foot" as a "bulge or distortion in the

23  body wall of the container outward from - - which is evidence of a strike or buckling of the body wall."

24  Dkt. 75-6, at 17.  Mr. Bilyk opined that the "the can failed via a circumferential fracture [crack] in the can

25  body at the bottom neck above the double seam." Dkt. 68-2, at 5.  Mr. Bilyk testified that after the crack

26  started right above the can's bottom's double seam, and the rest of the can flew up and hit something.

27  Dkt. 68-2, at 2.  He opined that "cause of the disengagement of the bottom is associated with abuse of the

28  container." Dkt. 68-2, at 5.  Mr. Bilyk stated that an "elephant foot" on the bottom of a can indicates

ORDER
Page - 4

1 "striking of the can bottom against a hard surface," which he equated with "abuse of the container."  Dkt.

2 68-2, at 6.

3      **B.**     **PROCEDURAL HISTORY**

4      On May 29, 2009, the Plaintiffs filed a complaint in Kitsap County, Washington  Superior Court.

5 Dkt. 2, at 5.  The case was removed to this Court on June 9, 2009.  Dkt. 2.  Plaintiffs bring claims under

6 RCW 7.72 *et al.*, Washington's Product Liability Act ("WPLA").  Dkt 15.  Plaintiffs allege that the can

7 was not reasonably safe under RCW 7.72.030(1) because:  (1) an alternative, feasible design existed that

8 would not have exploded; (2) adequate warnings or instructions were not provided about the risk of the

9 can exploding; and (3) it was unsafe to an extent beyond that which would be contemplated by the

10 ordinary consumer.  Dkt. 15, at 6-7.  Plaintiffs allege that the can was not reasonably safe in construction

11 under RCW 7.72.030(2) because it did not comply with implied warranties, deviated in a material way

12 from the design specifications of the Defendants, performance standards of the Defendants, and industry

13 standards.  Dkt. 15, at 7-8.  Plaintiffs allege that to the extent either Defendant is considered a product

14 seller, they are liable under RCW 7.72.040 because they failed to take reasonable steps to protect

15 Plaintiffs from harm based on their knowledge about the likelihood that the "necked-in" can design would

16 fail.  Dkt. 15, at 8-9.  Plaintiffs seek damages, attorneys' fees, and costs.  *Id.*

17      Plaintiffs settled their claims with Defendant Ball subject to Court approval of a minor settlement.

18 Dkt. 48.

19      **C.**     **PENDING MOTION**

20      The remaining Defendant, Sherwin-Williams, now files a Motion for Summary Judgment.  Dkts.

21 64 and 80.  Sherwin-Williams argues that Plaintiffs' failure to warn claim should be dismissed because

22 the claim is preempted by federal law and the product's warning labels comply with the federal

23 requirements.  *Id.*  Sherwin-Williams moves for dismissal of Plaintiffs' defective design claim arguing

24 that Plaintiffs can not make a sufficient showing under either the consumer expectations test or the risk

25 utility test . *Id.*  Lastly, Sherwin-Williams moves for dismissal of Plaintiffs' manufacturing defect claim,

26 arguing that Plaintiffs failed to demonstrate how "the subject product deviated from the ordinary and

27 regular production method, and therefore, contained a 'flaw.'"  *Id.*

28

ORDER
Page - 5

1  Plaintiffs first request a continuance of the summary judgment pursuant to Fed. R. Civ. P. 56(f).

2  Dkt. 77.  Plaintiffs then respond to the motion, arguing that there are issues of fact as to whether Sherwin-

3  Williams provided adequate warnings on the subject can.  *Id.*  Plaintiffs further argue that Sherwin-

4  Williams is liable for the product's defective design under the both the WPLA's consumer expectations

5  test and risk utility test.  Dkt. 77.  Plaintiffs argue Sherwin-Williams is liable under their manufacturing

6  defect claim because the subject can "deviated in a material way from its design specifications,

7  performance standards, and identical units in the same product line because it was not supposed to

8  explode when tapped or hit, and it was not intended to burst at room temperature."  *Id.*

9  This opinion will first address Plaintiffs' motion for a continuance (Dkt. 77) and then Sherwin-

10  Williams' motion for summary judgment (Dkt. 64).

## II.    DISCUSSION

### A.    SUMMARY JUDGMENT - STANDARD

13  Summary judgment is proper only if the pleadings, depositions, answers to interrogatories,

14  admissions, and disclosure materials on file, together with the affidavits, if any, show that there is no

15  genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.

16  R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the nonmoving party

17  fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving

18  party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine

19  issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

20  the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

21  (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical

22  doubt.");  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there

23  is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the

24  differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec.

25  Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

26  The determination of the existence of a material fact is often a close question.  The court must

27  consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

28  preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809

ORDER
Page - 6

1
2
3
4
5
6
7

F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

8

### B.    MOTION FOR CONTINUANCE UNDER FED. R. CIV. P. 56(f)

9

Fed. R. Civ. P. 56(f) provides:

10

11

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

12
13
14
15
16
17
18
19

To prevail under this Rule, parties opposing a motion for summary judgment must make "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *Blough v. Holland Realty Inc*., 574 F.3d 1084, 1091(9th Cir. 2009)(*citing Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129-30 (9th Cir. 2004)).  The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that the additional evidence would prevent summary judgment.  *Id*.  (*citing Chance v. Pac-Tel Teletrac Inc*., 242 F.3d 1151, 1161 n. 6 (9th Cir. 2001)).

20
21
22

Plaintiffs' motion for a continuance (Dkt. 77) should be denied.  Although Plaintiffs have made a timely application, they have not identified additional relevant information which would prevent summary judgment.  Plaintiffs' recent motion to compel was denied.  Dkt. 84.

23
24

### C.    FAILURE TO WARN CLAIM AND DEFENDANT'S FEDERAL HAZARDOUS SUBSTANCES ACT PREEMPTION DEFENSE

25
26
27
28

According to Sherwin-Williams, the aerosol can at issue is a household product that is considered "extremely flammable" and is in a "self-pressurized container," and so the Federal Hazardous Substances Act, 15 U.S.C. § 1261 *et seq*., ("FHSA"), governs its labeling.  Dkt. 67, at 2-3.  Plaintiff provides no evidence to counter Sherwin-Williams' assertion that the product's label is governed by FHSA.  Sherwin-

ORDER
Page - 7

1
2
3
4
5

Williams further argues that Congress intended for FHSA to preempt Plaintiffs' failure to warn claims asserted under the WPLA.  Dkt. 64.  This opinion will first consider whether FHSA wholly preempts Plaintiffs' failure to warn claim, and if it does not, to what extent FHSA allows state law claims.  Lastly, this opinion will address whether Plaintiffs' point to any evidence to support their WPLA-based failure to warn claim.

6
7
8
9
10
11
12

The Supremacy Clause of the U.S. Constitution provides, "[t]his Constitution and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Article VI, clause 2.  Congress has the power under the Supremacy Clause to pre-empt state law.  *Northwest Central Pipeline Corp. v. State Corp.*, 489 U.S. 493, 509 (1989).  In order to determine whether it has exercised this power, the Court is required to examine congressional intent.  *Id.*  Pre-emptive intent can be either "express" or "implied."  *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 884 (2000).

13
14
15
16
17
18

Enacted in 1960, the FHSA provides for "nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are intended or suitable for household use."  *See Moss v. Parks Corp.*, 985 F.2d 736 (4th Cir. 1993) (*citing* House Comm. On Interstate and Foreign Commerce, Federal Hazardous Substances Labeling Act, H.R.Rep. No. 1861, 86th Cong., 2d Sess. 2 (1960), reprinted in 1960 U.S.C.C.A.N. 2833, 2833).  The FHSA contains a "limited preemption provision" which provides:

19
20
21

> [I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) [15 U.S.C. §§ 1261(p) or 1262(b) ] designed to protect against a risk of illness or injury associated with the substance, no State ... may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under 2(p) or 3(b).

22
23
24
25
26
27
28

*Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941, 945 (9th Cir. 1992) (*citing* 15 U.S.C. § 1261 note (b)(1)(A) (1988) (Effect Upon Federal and State Law, § (b)(1)(A), Pub. L. 94-284 § 17(a)).  Accordingly, the FHSA "expressly preempts all state mandated precautionary labeling that is not identical to that required by the Act."  *Chemical Specialties,* at 949.  The Ninth Circuit has not specifically ruled on whether a state law failure to warn cause of action would exist if the state law requirements were identical to those required under the FHSA.  Such a cause of action appears consistent with the language in the statute, and the Fourth Circuit Court of Appeals has found such a cause of action exists.  *See Moss v.*

*Parks Corp*., 985 F.2d 736 (4th Cir. 1993). In *Moss*, the Fourth Circuit held that "in an area of limited Congressional preemption such as the FHSA, a common law tort action based upon failure to warn may only be brought for non-compliance with existing federal labeling requirements. In actions such as the present one, if the plaintiff requests a label that is 'more elaborate or different' than the one required by the FHSA and its regulations, the claim is preempted." *Moss*, at 740. This Court finds the holding and reasoning in *Moss* persuasive, and concludes that, as a threshold matter, a state law failure to warn claim exists if the state law labeling requirements are identical to those required under the FHSA.

The next issue, then is to determine whether the WPLA labeling requirements are identical to those required by FHSA. Under regulations promulgated under FHSA, self-pressurized containers must contain the following warning: "WARNING--CONTENTS UNDER PRESSURE Do not puncture or incinerate container. Do not expose to heat or store at temperatures above 120° F. Keep out of the reach of children." 16 C.F.R. § 1500.130 (b). That regulation further provides that "'CAUTION' may be substituted for the word 'WARNING.' A practical equivalent may be substituted for the statement 'Keep out of the reach of children.'" *Id.* Pursuant to 16 C.F.R. § 1500.130 (c):

> That portion of the warning statement set forth in paragraph (b) of this section in capital letters should be printed on the main (front) panel of the container in capital letters of the type size specified in § 1500.121(c). The balance of the cautionary statements may appear together on another panel if the front panel also bears a statement such as "Read carefully other cautions on ---------- panel."

Lastly, 16 C.F.R. § 1500.130 (d) provides: "[i]f an article has additional hazards, such as skin or eye irritancy, toxicity, or flammability, appropriate additional front and rear panel precautionary labeling is required." Under WPLA,

> (b) A product is not reasonably safe because adequate warnings or instructions were not provided with the product, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.
>
> (c) A product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured where a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured. In such a case, the manufacturer is under a duty to act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users.

RCW 7.72.030.

ORDER
Page - 9

1

2

3

4

5

6

7

To the extent that the WPLA would require more extensive labeling than is required under the FHSA, the Plaintiffs' claim for failure to warn under the WPLA is preempted by FHSA and should be dismissed.  To the extent that the WPLA's language could be construed requiring identical labeling as the FHSA, the claim is not preempted.  The sweeping language of WPLA is so construed here.  Accordingly, so long as a Plaintiffs charge Sherwin-Williams with violations of FHSA-mandated labeling requirements and do not seek "more stringent labeling requirements, the Plaintiff[s'] common law tort action for damages is not preempted." *Moss,* at 740-741.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Plaintiffs' claim for failure to warn should be dismissed because Plaintiffs have failed to show an issue of fact as to whether Defendants have complied with the FHSA labeling requirements.  The warning labels on the front of the subject can provide:  "Danger!  Extremely Flammable - Vapors May Cause Flash Fires! Contents Under Pressure.  Vapor Harmful.  Irritates Eyes, Skin and Respiratory Tract."  Dkt. 67, at 2 and 5 and Dkt. 75-7, at 33.  The front panel further advises the user to "carefully read CAUTIONS on back panel."  *Id.*  The back panel states: "DANGER! . . . . CONTENTS UNDER PRESSURE.  Avoid prolonged exposure to sunlight or heat from radiators, stoves, hot water and other heat sources that may cause bursting.  Do not puncture, incinerate, burn or store about 120 [degrees] F (49 [degrees] C) . . . KEEP OUT OF THE REACH OF CHILDREN."  *Id.*  Aside from substituting the word "DANGER!"  for the word "Caution!," mandated by FHSA, the language in Sherwin-Williams' warnings is the same or provides more extensive cautions than required by FHSA.  Plaintiffs have failed to make any showing  that Sherwin-Williams is not in compliance with FHSA's labeling requirements.  Plaintiffs point to a case from the Washington Court of Appeals for the proposition that compliance with federal regulations does not necessarily mean that the product's warnings were adequate.  Dkt. 77, at 20 (*citing Ayers By and Through Smith v. Johnson & Johnson Baby Products*, 59 Wash.App. 287, 293-94 (1990)).  *Ayers*, however, is not applicable for key reasons: it did not involve FHSA, nor did it address federal preemption.  Plaintiffs have failed to point to an issue of fact showing that Sherwin-Williams is not in compliance with FHSA's labeling requirements.  Accordingly, Plaintiffs' failure to warn claim should be dismissed.

27

**D.    DEFECTIVE DESIGN CLAIM UNDER WPLA**

28

Under the WPLA, "[a] product manufacturer is subject to liability to a claimant if the claimant's

1   harm was proximately caused by the negligence of the manufacturer in that the product was not

2   reasonably safe as designed." RCW 7.72.030(1). Sherwin-Williams states that it "reserves its rights to

3   address component part manufacturer liability of Ball at a later time should this Court fail to grant the

4   instant request for Summary Judgment of Dismissal." Dkt. 64, at 16 n. 48. Accordingly, for the purposes

5   of this motion alone, Sherwin-Williams does not appear to be contesting that it is at least one of the

6   product's manufacturers. Although RCW 7.72.030 uses the term "negligence," strict liability is the

7   applicable standard for a design defect product liability claim maintained under RCW 7.72.030. *Soproni*

8   *v. Polygon Apartment Partners*, 137 Wash.2d 319, 326-327 (1999)(*citing Falk v. Keene Corp.*, 113

9   Wn.2d 645, 653 (1989)).

10        A plaintiff who seeks to establish liability of a manufacturer under RCW 7.72.030 may do so in

11  two ways. *Soproni,* at 326-327 (1999)(*citing Falk v. Keene Corp.*, 113 Wn.2d 645, 653 (1989)). One

12  way is referred to as the "consumer expectations" test, "which requires the plaintiff to show that the

13  product was 'unsafe to an extent beyond that which would be contemplated by the ordinary consumer.'"

14  *Id.,* at 327. The second way a plaintiff may attempt to establish liability is the "risk utility test." *Id.,* at

15  326.  There a plaintiff must show that, "at time of manufacture, the likelihood that the product would

16  cause the plaintiff's harm or similar harms, and the seriousness of those harms, outweighed the

17  manufacturer's burden to design a product that would have prevented those harms and any adverse effect

18  a practical, feasible alternative would have on the product's usefulness." *Id.* Each of these tests is

19  examined below.

20              1.        Consumer Expectations Test

21       WPLA provides that "[i]n determining whether a product was not reasonably safe under this

22  section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which

23  would be contemplated by the ordinary consumer." RCW 7.72.030(3). Under the consumer expectations

24  test, "a plaintiff need not prove that a product is defective as a separate matter." *Lenhardt v. Ford Motor*

25  *Co.*, 102 Wash.2d 208, 211 (1984)(*internal citations omitted*). "Recovery is allowed if the jury

26  determines that the product is dangerous to an extent beyond that which is contemplated by the ordinary

27  consumer." *Id.*

28       Sherwin-Williams motion to summarily dismiss Plaintiffs' defective design claim under the

WPLA should be denied.  Plaintiffs have pointed to evidence in the record which, if believed by a jury, shows that the product "was unsafe to an extent beyond that which would be contemplated by the ordinary consumer."  RCW 7.72.030(3).  There is evidence in the record that an ordinary consumer would believe that there was an agitator ball in the can.  Dkts. 68-4, at 3; 75-3, at 25-30, and 68-5.  There is evidence that the agitator balls sometimes got stuck in the bottom of the cans.  *Id.*  Both the Plaintiff and Mr. Quesada testified that it was a common practice to tap the cans on various surfaces to loosen the agitator ball.  Dkts. 68-4, at 4-5 and 75-3, at 27-28.  Both men did so on the day of the accident.  *Id.* There are issues of fact as to the amount of force Mr. Wilson used.  Dkts. 68-4, at 8-9; 75-3, at 19; and 69 at 2.  He claims he "tapped" the can, while there is evidence that he hit the can with more force.  Dkts. 68-4, at 8-9; 75-3, at 19; and 69 at 2; and 68-5.  Further, some of Sherwin-Williams competitors advise customers not to "hit" or "strike" the cans.  Dkt. 75-5, at 31-36.  A jury may find any or all of this evidence relevant as to the reasonable expectation of the ordinary consumer regarding treatment of these kinds of cans.

Sherwin-Williams argues that it is in compliance with all laws and regulations regarding the subject product.  Dkt. 64.  Even if true, this is not definitive as to whether a product was unsafe beyond what an ordinary consumer would expect.  Although conformity with legislative and/or administrative regulatory standards may satisfy consumer expectations, evidence of compliance with such codes does not foreclose a plaintiff's claim under the WPLA.  *Soproni*, at 328.  "Evidence of whether or not a product was in compliance with [such standards] is merely relevant evidence that may be considered by the trier of fact.  Fundamentally, it is for the trier of fact to determine if the product was unsafe to an extent beyond that which would be expected by an ordinary consumer."  *Soproni*, at 328.  Defendant Sherwin Williams' motion to summarily dismiss Plaintiffs' design defect claim should be denied.

2.      Risk Utility Test

Under the "risk utility test," Plaintiffs must show that there are issues of fact as to whether, at time of manufacture, the likelihood that the neck-in can would cause Mr. Wilson's harm, and the seriousness of that harm, "outweighed the manufacturer's burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have on the product's usefulness." *Soproni,* at 326.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

Sherwin-Williams motion to dismiss Plaintiffs' defective design claim should be denied. There are issues of fact regarding the likelihood of the harm. Sherwin-Williams contends that the likelihood of harm is non-existent absent abuse of the product. Dkt. 64. Mr. Blum who testified for Ball, stated that in 2005, Ball made around 300 to 500 million neck-in cans. Dkt. 75-6, at 13. Mr. Blum testified that he had been involved in around four other cases involving circumferential failures of necked-in cans. Dkt. 75-6, at 15-16. Plaintiffs point to Ball's responses in discovery that there had been eight such failures, some involving Sherwin-Williams. Dkt. 75-4, at 2-3. Based upon Mr. Blum's testimony and the discovery responses, the likelihood of injury is low. Plaintiffs have shown, however, that this self-pressurized can's explosion can result, and did in this case, in causing a serious harm. Dkt. 75-6, at 20. Moreover, Plaintiffs' have pointed to evidence in the record that, at the time the subject product was made (2005), there existed a "practical, feasible alternative" that would have no adverse effect on the product's usefulness - the straight-sided design can. Dkt. 75-6, at 8-10. Further, Plaintiffs have provided evidence that the straight-sided can design would have prevented the harm Plaintiff suffered - Mr. Blum and Mr. Bilyk, both testifying for Ball, stated that they were not aware of any straight-sided design can circumferential failures. Dkt. 75-6, at 22 and 75-8, at 2. Sherwin-Williams acknowledges that they made the decision to use the necked-in design for aesthetic reasons. Dkt. 75-8, at 23. There was no cost difference to Sherwin-Williams between the necked-in design and the straight-sided can design. Dkt. 75-7, at 12. Sherwin-Williams' motion to summarily dismiss Plaintiffs' design defect claim should be denied. There are sufficient issues of fact as to whether the likelihood and seriousness of harm of the necked-in design outweighs the impact that the straight-sided design has on the usefulness of the product.

21
22

Defendant Sherwin-Williams again argues that it was in compliance with federally mandated regulations and requirements. Dkt. 64, at 22.

23
24

> Although codes and standards implicitly reflect a consideration of the balance between the likelihood and seriousness of harm on the one hand, and the impact that an alternative design would have on a product's usefulness on the other, the fact that there is compliance with codes does not, as we have stated, trump the declarations of expert witnesses.

25

*Soproni*, at 330. Sherwin-Williams' motion should be denied as to this claim.

26

### E.      DEFECTIVE MANUFACTURING CLAIM UNDER WPLA

27
28

Pursuant to RCW 7.72.030(2), "[a] product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in

ORDER
Page - 13

1

2

3

4

construction … ." The WPLA further provides "[a] product is not reasonably safe in construction if, when the product left the control of the manufacturer, the product deviated in some material way from thedesign specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units of the same product line." RCW 7.72.030(2)(a).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Sherwin-Williams' motion to summarily dismiss Plaintiffs' defective manufacturing claim should be denied. There are issues of fact as to whether the subject can "deviated in some material way from the design specifications," or "performance standards," or "otherwise identical units of the same product line." RCW 7.72.030(2)(a). Sherwin-Williams points to the declaration of Barry Lynn, a Sherwin-Williams Regional Technical Director, who states that he reviewed the production records for the "Minwax products produced from October 2005-January of 2006, and have found no indication of any manufacturing anomalies or defects associated with this batch of products." Dkt. 65, at 2. He states that Sherwin-Williams maintains records of each batch of products produced to ensure that no anomalies or failures occur in any part of the production process. Dkt. 65, at 2. He states that "Sherwin-Williams' records for the production period of the subject Minwax can show no malfunctioning of the hot water bath, no anomalies in the production cycle regarding the Minwax product production or any other information which would indicate manufacturing defect in the subject Minwax product." Dkt. 65, at 2. Plaintiff argues that "[b]oth Ball and Sherwin-Williams asserted that the Minwax can is not supposed to violently explode if it is used in the manner described by [Plaintiff Wilson], and both concede that the can should not burst open at room temperature." Dkt. 77, at 23. Plaintiffs argue that the can suffered from a manufacturing defect because it exploded when tapped and burst at room temperature. *Id.* In light of the fact that there are issues of fact as to how hard Mr. Wilson tapped, Sherwin-Williams' motion to dismiss Plaintiffs' defective manufacturing claim should be denied.

23

24

25

In regard to their manufacturing defect claim, Plaintiffs appear to be alluding to conclusions found in a report by Michael Fox, Ph.D., filed in the record by Sherwin-Williams. Dkt. 68-5. Dr. Fox opines, for example, that:

26

27

> Since the evidence Minwax exploded inside the controlled environment of the Ace Hardware store, the temperature was likely on the order of 75F. Hence the internal pressure of the evidence Minwax at that temperature would be on the order of 53 psig. This is far less than the minimum [Department of Transportation] burst pressure of 172

28

ORDER
Page - 14

1
2
   psig.  In other words, one would not expect Minwax to explode unless the pressure inside
   was at least 172 psig, which would require a temperature on the order of 170F.  Since the
   Wilson-Minwax did not meet DOT requirement, it was defective.

3   Dkt. 68-5, at 13.  Dr. Fox further opines that "the underlying causes for the unexpected explosion are

4   defective design, defective materials and defective fabrication that introduced surface flaws."  Dkt. 68-5,

5   at 59.  Although no party has attacked the admission of this report, the Court's consideration of it was

6   minimal because  no proper foundation has been laid for its admission into evidence.  It appears Sherwin-

7   Williams included it in support of its argument that Plaintiffs' theory of can failure was too "complex and

8   sophisticated" for the consumer expectations test.  Dkt. 64, at 18.  This argument is without merit.

9   Sherwin-Williams provides no authority to support this argument.

10                                           **III.    ORDER**

11          Therefore, it is hereby **ORDERED** that:

12   •      Plaintiffs' Motion for a continuance under Fed. R. Civ. P. 56(f) is **DENIED**;

13   •      The Sherwin-Williams Company's Motion for Summary Judgment of Dismissal (Dkt. 64) is

14          •       **DENIED** as to Plaintiffs' defective design and manufacturing claims, and

15          •       **GRANTED** as to Plaintiffs' failure to warn claim;

16          •       Plaintiff's failure to warn claim is **DISMISSED**.

17          The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any

18   party appearing *pro se* at said party's last known address.

19          DATED this 22nd day of June, 2010.

20

21                                    _____
                                      Robert J. Bryan
22                                    United States District Judge

23

24

25

26

27

28

ORDER
Page - 15